UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STELLA PAWLOSKI,
    Plaintiff                                Civil Action No. 08-13980

v.

                                         District Judge Denise Page Hood
                                         Magistrate Judge R. Steven Whalen

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Stella Pawloski brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits and Supplement Security Income under the Social Security Act. Both parties have filed motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's motion be GRANTED and Plaintiff's motion DENIED.

## PROCEDURAL HISTORY

On October 31, 2000, Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") alleging an onset date of May 15, 2000 (Tr. 52-54, 197-201). After the initial denial of benefits, she requested an administrative hearing, held before Administrative Law Judge ("ALJ") Ethel Revels in Port Huron, Michigan on May 15, 2002 (Tr. 673-714). On July 23, 2003, ALJ Revels issued a partially favorable decision, finding Plaintiff disabled for a closed period of benefits between May 15, 2001 and November 16, 2001 (Tr. 218). On April 28, 2005, the Appeals Council remanded the case

for rehearing (Tr. 230-234). ALJ Revels held a second hearing on November 16, 2006 (Tr. 715). Plaintiff, represented by attorney Mikel Lupisella, testified (Tr. 720-749) as did Vocational Expert ("VE") Richard Szydlowski (Tr. 750-759). On August 28, 2007, the ALJ found that Plaintiff was not disabled (Tr. 32). On July 15, 2008, the Appeals Council denied review (Tr. 11-13). Plaintiff filed for judicial review on September 15, 2008.

## BACKGROUND FACTS

Plaintiff, born August 29, 1957 was just short of her 50th birthday when ALJ Revels issued her decision (Tr. 52). She completed high school and worked previously as a packager and assembler (Tr. 68, 184). She alleges disability as a result of hypertension, arthritis, shoulder problems, respiratory problems, obesity, and depression (Tr. 24).

### A.     Plaintiff's Testimony

Plaintiff, 5'6-1/2" and 319 to 323 pounds, testified that she had recently lost 57 pounds (Tr. 721). She reported that she and her husband were living with her mother while they renovated their own home (Tr. 722). Plaintiff indicated that she regularly performed kitchen chores and vacuumed, but that her husband did the laundry (Tr. 722). She alleged that she had been ordered by her physician to stay away from knives because she "might pass out and land on one of them" (Tr. 722). She denied performing outdoor work or membership in clubs or organizations (Tr. 723). Plaintiff testified that her physician had forbidden her from walking (Tr. 723). She alleged that if the grocery store did not provide motorized chairs for customer use, she would regularly experience an asthma attack in the course of her grocery shopping (Tr. 723). Plaintiff estimated that she could walk for up to half an hour on a flat surface, stand for 15 minutes, and sit for half an hour (Tr. 724, 740). She alleged sleep disturbances, adding that she often felt tired (Tr. 724-726). She testified that she had been told by her physician not to lift more than a gallon of milk because of muscle weakness due

to fibromyalgia (Tr. 727). She indicated that pushing and pulling hurt her back, adding that she had not attempted to reach overhead "in a long time" (Tr. 727). She testified that her physicians forbade her from driving, reporting that her most comfortable position was seated with her legs elevated (Tr. 728). Plaintiff also alleged damaged lower back muscles and water retention (Tr. 728). Noting that she did not have health insurance, Plaintiff indicated that she did not take prescription medicine (Tr. 730).

Plaintiff testified that she quit work in May, 2000 due to her fear that she would "black out" and injure herself (Tr. 730). She alleged cognitive impairments, noting that she regularly forget why she had walked into a room, had to read a page of reading material twice, and forgot what her husband told her (Tr. 731). She reported that she had not blacked out in the last year, but experienced dizziness regularly (Tr. 731). Plaintiff also alleged that she had "a floating bone" in her left knee (Tr. 733). She indicated that she sought emergency treatment for an asthma attack approximately six months before the hearing (Tr. 733). She reiterated that she was unable to afford medication, alleging that she made inquiries to the Health Department but that "they didn't know . . . anything" (Tr. 735). Plaintiff alleged that at the times she had blacked out in the past, her mother and husband either called an ambulance or "just let [her] lay still until "the blood . . . circulate[d] back up" (Tr. 738).

Plaintiff testified that during the period that she had insurance coverage, she took Advair for asthma, noting that she discontinued it after it "played tricks" on her heart, requiring a hospitalization (Tr. 743). In response to questioning by her attorney, Plaintiff testified that she had not received any income since May, 2000, stating that she and her husband subsided on his $1,150 per month pension (Tr. 747). Plaintiff denied receiving cash assistance or food stamps (Tr. 747).

**B. Medical Records**

**1. Treating Sources**

In May, 1999, Plaintiff underwent a consultive cardiovascular examination (Tr. 88). John Miles McClure II M.D, noting a history of vasovagal syncope, remarked that since being treated with Norpace, Plaintiff's symptoms had not returned (Tr. 88). Plaintiff reported chest pain and shortness of breath (Tr. 88). Dr. McClure diagnosed her with GERD and prescribed Prilosec (Tr. 89). Remarking on her morbid obesity, he also prescribed a Nitro-Dur Patch for possible cardiac problems (Tr. 89). In March, 2000, Dr. McClure, noting renewed vasovagal episodes, re-prescribed Norpace as well as Zoloft (Tr. 90-91). A cardiac catherization performed the following month was negative (Tr. 95, 99, 103). Also in April, 2000, an echocardiogram yielded inconclusive results due to Plaintiff's size (Tr. 92). The same month, a Holter monitor showed the absence of dysrhythmias despite Plaintiff's continued complaints of chest pain (Tr. 94-95).

In May, 2000, Plaintiff received a prescription for Claritin (Tr. 113). Plaintiff was advised to "stay off work" until a followup appointment the following Thursday (Tr. 113). Amar Singh, M.D., diagnosed bronchitis and GERD (Tr. 115). Imaging studies of the chest showed the absence of intrathoracic disease (Tr. 117). The same month, Plaintiff was examined at University of Michigan Medical Center by Grace H. Elta, M.D. (Tr. 121). Dr. Elta, noting complaints of chest pain, headaches, fatigue, and snoring, ruled out cardiac disease, but advised an upper endoscopy (Tr. 122). The following month Dr. Elta, noting a weight of 308, advised a weight reduction plan (Tr. 123). Plaintiff admitted that she had not blacked out in the past year, but reported daily dizzy spells (Tr. 124). September, 2000 treating notes state that Plaintiff was currently "out of work" (Tr. 135). The same month, Dr. Singh referred to Plaintiff as a "medical mystery (Tr. 136).

In January, 2001, Kurt Jacobs, D.O., noted a history of vasovagal syndrome, asthma,

depression, and hypertension (Tr. 347). The same month, Dr. Singh noted that she was "doing quite well" taking Promatine (Tr. 141). Plaintiff was prescribed physical therapy for left shoulder pain (Tr. 159-160). Imaging studies of the left shoulder were negative other than "probable calcification" (Tr. 163). March, 2001 treating notes indicate that Plaintiff's shoulder had improved but was not "100%" (Tr. 166). In April, 2001, Plaintiff was admitted to the hospital after becoming dizzy (Tr. 144). An EKG was negative (Tr. 145). Dr. Singh noted that Plaintiff should remain "on seizure precautions" (Tr. 145). The following month, Dr. Singh noted that Plaintiff's husband reported that Plaintiff "lack[ed] energy or ambition" (Tr. 174). Plaintiff requested more aggressive treatment for her shoulder pain (Tr. 174). In July, 2001, John K. Fink, M.D., opined that Plaintiff's vasovagal episodes were attributable to "intermittent hypotension" (Tr. 178). In October, 2001, Plaintiff did not show up for an appointment to appraise her shoulder, but told treating staff that she was doing physical therapy (Tr. 172). The same month, nerve conduction studies of the upper and lower extremities were normal (Tr. 295). The following month, Hadan Oral, M.D., noted that Plaintiff experienced reduced vasovagal symptoms while on midodrine therapy (Tr. 102).

In February, 2002, Dr. Singh, stating that "there is no reason for me to believe that [Plaintiff] does not have a medical illness that does not warrant any treatment" or "question [her] truthfulness," urged the Family Independence Agency ("FIA") to provide her with access to prescription medications (Tr. 194). Rheumatology clinic notes from June and August, 2002 refer to a history of fibromyalgia and right knee pain (Tr. 281, 286). X-rays of the lumbar spine and right knee performed in June, 2002 were unremarkable (Tr. 288, 322). In September, 2002, Dr. Singh noted that "[e]xtremities show no edema" (Tr. 316). Plaintiff, weighing 333 pounds, indicated that she was "doing well" (Tr. 316).

A February, 2003 chest x-ray was unremarkable (Tr. 306). In April, 2003, Suresh

Tumma, M.D., noting that he had been asked for "a second opinion," opined that Plaintiff had "significant[] and disabling symptoms secondary to her syncope" and "should continue to stay off work" (Tr. 352, 357). The same month, Plaintiff sought emergency treatment after her right leg "went thr[ough]" a porch floor (Tr. 378). Imaging studies showed no fractures (Tr. 379). In June, 2003, Mutee Abdeljaber M.D., noting that Plaintiff had recently sought emergency treatment for allergies, observed that she currently took Paxil and Singulair (Tr. 337). He noted further that "[m]any of her family members [were] cigarette smokers" and that she continued to keep an indoor dog (Tr. 337). In December, 2003, Plaintiff was admitted to the hospital with chest pain and jaw numbness (Tr. 451). Imaging studies showed no evidence of myocardial ischemia (Tr. 362, 518). An EKG was similarly unremarkable (Tr. 461, 519).

In January, 2004, Dr. Tumma observed that Plaintiff was "doing well" (Tr. 354). In August, 2004, Dr. Tumma again noted that Plaintiff was "doing well" with no episodes of syncope in the past six months (Tr. 353). January, 2005 treating notes show that Plaintiff took Paxil and Claritin (Tr. 627). In May, 2005, Plaintiff sustained second degree burns to her hand while cooking (Tr. 639). In February, 2006, Plaintiff sought emergency treatment for shortness of breath upon exertion (Tr. 651). She was given Prednisone and Albuterol before being released (Tr. 652).

### 2. Consultive and Non-examining Sources

In January, 2001, a Residual Functional Capacity performed on behalf of the SSA found that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; walk, stand, or sit for about six hours in an eight-hour day; and an unlimited ability to push and pull in the upper and lower extremities (Tr. 150). Plaintiff was precluded from all ladder, rope, and scaffold climbing and limited to *occasional* ramp and stair climbing (Tr. 151). She was

deemed able to balance, stoop, kneel, crouch, and crawl on a frequent (as opposed to *constant* basis) (Tr. 151). The Assessment found the absence of manipulative, visual, communicative, or environmental limitations (Tr. 152-153).

### C. VE Testimony

VE Richard Szydlowski classified Plaintiff's past relevant work as a glass cutting machine tender as semiskilled at the medium exertional level and job as a machine operator as unskilled/heavy[1] (Tr. 750, 754). He found the absence of transferrable skills (Tr. 754).

The ALJ then posed the following question, taking into account Plaintiff's age, education level and work experience:

> "[A]ssume . . . for that our hypothetical Claimant needs work that is simple, repetitive type, what we call unskilled because the moderate limitations and ability to maintain concentration for extended periods due to pain, as well as moderate limitations in the ability to carry out detailed instructions because of a level of depression. . . . [T]hat work also must not require operating on uneven surfaces, must not require frequent bending nor frequent, prolonged use of the hands or arms overhead. No working at hazardous heights or around dangerous machinery. Must not require sudden movements of getting up and down. . . . Must not require any driving. . . . The work must be in a relatively clean environment. If you assume that, what jobs would our hypothetical Claimant be vocationally qualified to perform?"

(Tr. 755).

VE testified that given the above limitations, the individual could perform the exertionally medium work of an assembler (6,000 jobs in the regional economy) janitor/cleaner (5,000), hand packer and packager (5,000) (Tr. 755). At the exertionally *light*

---

[1] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

level, the VE found that the individual could perform the work of a security monitor (7,000), assembler (2,000), inspector (2,200), hand packer/packager (3,000), and cashier (6,000) (Tr. 756). The VE found that the individual could also perform the sedentary work of a clerical handler (2,000), assembler (2,500), inspector/checker (1,000), surveillance systems monitor and receptionist (2,000) (Tr. 756).

The VE testified further that if the individual were further limited to work with a sit/stand option, the exertionally medium jobs would be eliminated (Tr. 756-757). He stated that the light job numbers would be reduced as follows: security jobs (2,000), assembler (1,700), packer/hand packer (1,500), cashier (6,000) (Tr. 757). The VE also found that the individual could perform the job of a door greeter (500), adding that his sedentary findings would remain unchanged (Tr. 757). In response to the additional limitation of a sit/stand option only allowing the individual to sit for thirty minutes at one time, he found no impact on the revised light jobs, but in the sedentary category, the clerical handling, receptionist, and assembler positions would be halved (Tr. 757-758). The VE stated that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 758).

### D.  The ALJ's Decision

ALJ Revel found that although Plaintiff's conditions of "hypertensive cardiovascular disease, osteoarthritis, shoulder impingement, back disorder, asthma, obesity, depression, and vasodepressive syncope episodes" were severe impairments under 20 C.F.R. § 404.1520(c), none of the conditions met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation 4 (Tr. 24-25).

The ALJ determined that although Plaintiff was unable to perform her past relevant work, she retained the following residual functional capacity ("RFC"):

> "light work with a sit/stand option that does not require sitting for more than 30 minutes at a time or standing for more than 30 minutes at a time; or walk more than one black at a time; perform simple, repetitive tasks because of moderate limitations in the ability to maintain concentration for an extended period of time and in the ability to carry out detailed instructions due to pain and depression; perform work restricted to a relatively clean environment, not requiring operating on uneven surfaces, or frequent bending, or prolonged frequent overhead use of the hands, or working at hazardous heights or around dangerous machinery, or involving sudden movements, or driving"

(Tr. 26).

Citing the VE's job numbers reflecting the sit/stand option limiting Plaintiff to 30 minutes of sitting, *supra,* the ALJ found that Plaintiff was capable of a significant number of exertionally light and sedentary positions (Tr. 31-32).

The ALJ found Plaintiff's claims "not entirely credible" (Tr. 28). In support of the credibility determination, the ALJ noted that objective medical testing and Plaintiff's activities of daily living stood at odds with her allegations of disability (Tr. 28-30). She found that the opinions of Drs. Singh, Tumma, Jacobs were not well supported by objective medical testing (Tr. 30).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en

banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. The Hypothetical Question

Plaintiff argues first that the hypothetical question posed to the VE did not account for

her full degree of limitation.  *Plaintiff's Brief, Docket #10* at 6.  Citing *Varley v. Secretary of Health & Human Services*, she contends that the omission of critical impairments was due to the ALJ's failure to "properly evaluate" her medical record.  *Id.*

*Varley* sets forth the Sixth Circuit's requirements for a hypothetical question. "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays [the] plaintiff's individual physical and mental impairments" (internal citations omitted). *Id.* at 779; *See also Webb v. Commissioner of Social Sec.* 368 F.3d 629, 632 (6th Cir. 2004).  The hypothetical question must be supported by record evidence.

Contrary to Plaintiff's contention, the ALJ's choice of hypothetical restrictions is amply supported by record evidence.  As noted in the administrative opinion, while Plaintiff allegedly experienced frequent dizziness, she admitted that she had "blacked out" on only rare occasions since May, 2000 (Tr. 29).  Nonetheless, the hypothetical question accounted for the condition by including a preclusion on driving, working with heights, or around "dangerous machinery" (Tr. 29, 755).  Acknowledging Plaintiff's respiratory problems as a result of asthma and allergies, the ALJ limited her to working in a "clean environment" (Tr. 755).  In addition, Plaintiff was restricted to work which would accommodate her "moderate" concentrational deficiencies and alleged forgetfulness (Tr. 755).  The ALJ addressed Plaintiff's impairments as a result of morbid obesity and alleged postural limitations by including a sit/stand option, and limiting her to sitting for no more than half an hour at a time (Tr. 757).

While Plaintiff argues that the hypothetical question did not account for her alleged "work preclusive" need to nap multiple times each day, the ALJ permissibly rejected this testimony, observing the absence of evidence supporting the claims of "extreme sleep

disturbance" (Tr. 30).  *See Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994)(*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987)).  "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals."   The ALJ also noted that Plaintiff'S continued ability to cook, vacuum, and shop for groceries stood at odds with her allegations of disability (Tr. 29).

### B.  The Treating Physicians' Analysis

Plaintiff, arguing that the ALJ erred in rejecting the opinions of her treating physicians, contends that the ALJ made a "blanket assertion" that Dr. Singh's opinion was not supported by objective medical evidence.  *Plaintiff's Brief* at 10.   Plaintiff also faults the ALJ for rejecting Dr. Tumma's April, 2003 "disability" opinion.  *Id.* at 11(*citing* Tr. 352, 357).

"If uncontradicted, the [treating] physicians' opinions are entitled to complete deference." *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (FN 7)(6th Cir. 1991). "[I]f the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F. 3d 263, 266  (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544  (6th Cir. 2004)).  Further,

> "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

*Wilson,* at 544.

Regardless of whether substantial evidence is found elsewhere in the record to contradict the source's findings, the ALJ is required nonetheless to give "good reasons"

for rejecting the treating physician's opinion:

> "'The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"

*Wilson* at 544 (*citing Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)). The mere fact that a treating physician's opinion is contradicted by another source is not a sufficient basis for its rejection. *Hensley,* 573 F.3d at 267 ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion."). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings. *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391 -392 (6th Cir. 2004).

ALJ Revel's analyses of these treating sources are both procedurally and substantively sound.

### 1. Dr. Singh

The ALJ, while acknowledging Plaintiff's long-term relationship with Dr. Singh, found that his opinion that Plaintiff experienced "a chronic debilitating disorder" was not well supported by the evidence (Tr. 30). She noted that although Plaintiff had sought emergency treatment for chest pains numerous times, objective medical testing was negative for heart disease (Tr. 29-30 *citing* 194). The ALJ also cited Plaintiff's treating records which state that she was "doing quite well" while taking Promatine[2] (Tr. 29). She found further that Dr.

---

[2]Plaintiff cites Dr. Singh's allusion to her "truthfulness," in support of her truncated argument that the ALJ's credibility determination was faulty. *Plaintiff's Brief* at 11. However, the administrative opinion, while finding the presence of severe impairments,

Singh's February, 2002 request for low cost medication on Plaintiff's behalf, although including his opinion that Plaintiff was disabled, contained no mention of Plaintiff's residual abilities (Tr. 30). Further, the ALJ correctly noted that the issue of disability is "reserved to the Commissioner of Social Security" (Tr. 30 *citing* SSR 96-5p).

Additional record evidence supports the ALJ's finding. Plaintiff testified that she stopped working because her physicians "didn't want [her] to work with machinery" due to the vasovagal condition (Tr. 730). While the finding that Plaintiff should not work around dangerous machinery is well supported by substantial evidence, Dr. Singh did not weigh in on whether Plaintiff could perform other work (Tr. 730). Contrary to Dr. Singh's conclusion that Plaintiff was unable to function without her prescription medications, Plaintiff testified at the hearing that although she no longer took Promatine, she had not blacked out in over a year (Tr. 731). Despite Plaintiff's claim that allergy medicine "played tricks" on her heart, extensive medical testing failed to reveal any evidence of heart disease (Tr. 743).

### 2. Dr. Tumma

In April, 2003, Dr. Tumma found that Plaintiff "should continue to stay off work" due the vasovagal condition (Tr. 352, 357). However as discussed by the ALJ, his opinion that Plaintiff was disabled stands at odds with his own treating notes (Tr. 30). Apparently examining Plaintiff for the first time in April, 2003, Dr. Tumma did not examine her for

---

contains a two-page discussion of the evidence undermining Plaintiff's allegations of disability (Tr. 28-30 *citing* SSR 96p-7). The ALJ noted that Plaintiff admitted that she continued to perform housework, took care of her children (Tr. 29). The ALJ also found that she was asymptomatic while taking medication (Tr. 29). While Plaintiff complained of shoulder problems, treating records showed that she failed to show up for two scheduled appointments after reporting an improvement in her condition, "suggest[ing] that her symptoms either resolved or were exaggerated" (Tr. 30). The latitude generally ceded to an ALJ's credibility determination is appropriate here. *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993).

another six months, at which time he noted that she had not blacked out since her last visit and experienced only "on and off episodes of dizziness" (Tr. 355). The physician's January, 2004 treating notes are even less suggestive of disability, remarking that Plaintiff was "doing well and has not had any further episodes of chest pain" (Tr. 354). Likewise, August, 2004 treating notes state that Plaintiff was "doing well and has not had any episodes of syncope since her last visit" (Tr. 353).

In closing I note that while Plaintiff's claims of limitation are partially supported by record evidence, substantial evidence and a well-articulated discussion of her treating physicians' opinions support the non-disability finding. Plaintiff's regular activities, medical records, and testimony have not been cited to trivialize her legitimate medical problems, but to demonstrate that the ALJ's decision is easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level and as such, should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment be DENIED, and Defendant's Motion for Summary Judgment GRANTED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and

Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  August 28, 2009

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 28, 2009.

S/Gina Wilson
Judicial Assistant